# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| RAYMOND BOYD, et al., | ) | CASE NO. 4:15-cv-871 |
| | ) | |
| | ) | |
| PLAINTIFFS, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION AND |
| | ) | ORDER |
| SCHWEBEL BAKING CO., | ) | |
| | ) | |
| | ) | |
| DEFENDANT. | ) | |

Pending before the Court is the motion of plaintiffs, Raymond Boyd and Terry L. Vukich, seeking conditional certification of a collective action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.* (Doc. Nos. 38, 39 ["Con. Cert. Mot."].) Defendant Schwebel Baking Company ("defendant" or "Schwebel") opposes the motion (Doc. 45 ["Con. Cert. Opp'n"]), and plaintiffs have filed a reply. (Doc. No. 54 ["Reply"].) Schwebel has also moved for judgment on the pleadings as to the claim raised by plaintiff Boyd. (Doc. No. 47 ["JP Mot."].) Plaintiff Boyd opposes the motion (Doc. No. 56 ["JP Opp'n"]) and has moved to amend the complaint to substitute the bankruptcy trustee for plaintiff Boyd as a party plaintiff. (Doc. No. 50 ["Mot. Amend"].) Defendant has filed a response to the motion to amend. (Doc. No. 53 ["Amend Res."].) These motions are fully briefed and ripe for resolution.

## I. BACKGROUND

Schwebel is an Ohio-based corporation that "is in the business of baking and distributing various bread products." (Doc. No. 1 (Complaint ["Compl."]) ¶¶ 7, 10.) Its customers are located

in several states, including Ohio and Pennsylvania.[1] (Doc. No. 35 (Deposition of Jim Eckman ["Eckman Dep."]) at 806[2].) Schwebel maintains a "mixed fleet of delivery vehicles" for the distribution of its bread products consisting of trucks that weigh 10,000 pounds or less (the "small vehicles") and trucks that weigh more than 10,000 pounds (the "commercial vehicles"). (Compl. ¶ 13.) The company employs route sales delivery drivers ("route drivers")[3] to distribute its products to Schwebel's customers "including grocery stores, restaurants, schools, and food retailers." (*Id*. ¶ 11.)

Plaintiffs are former route drivers employed by Schwebel, who drove small vehicles during at least a part of a workweek within the last three years. (*Id*. ¶ 14.) Plaintiff Terry Vukich was employed by Schwebel as a route driver between 1976 and January 2015. (Doc. No. 32 (Deposition of Terry Vukich ["Vukich Dep."]) at 496; Doc. No. 37-4 (Declaration of Terry Vukich ["Vukich Decl."]) ¶ 3.) Plaintiff Boyd served as a route driver for Schwebel for approximately 25 years before he separated from Schwebel in January 2015. (Doc. No. 31 (Deposition of Raymond Boyd ["Boyd Dep."]) at 343, 347; Doc. No. 37-3 (Declaration of Raymond Boyd ["Boyd Decl."]) ¶ 3.)

Schwebel categorizes its customers as: (1) retail customers; (2) restaurants; (3) institutions (i.e., nursing homes, correctional facilities, hospitals, etc.); and (4) schools. (Doc. No. 36-1 (Declaration of Shannon M. Draher ["Draher Decl."]) ¶ 8, Ex. 4; Doc. No. 33 (Deposition

---

[1] Paul Schwebel, President of Schwebel, testified that Schwebel operates in six states: Ohio, Pennsylvania, New York, West Virginia, Michigan, and Indiana. (Doc. No. 33 (Deposition of Paul Schwebel ["Schwebel Dep."]) at 625.)

[2] All page number references are to the page identification number generated by the Court's electronic docketing system.

[3] In various documents in the record, the position is referred to as "route driver," "route sales driver," "RSR," "route sales representative," or "wholesale driver." The Court shall use the term "route driver" to refer to all personnel who drive a small vehicle along a set route.

of Paul Schwebel ["Schwebel Dep."]) at 621-22; Vukich Decl. ¶ 7; Boyd Decl. ¶ 8.) The largest single source of revenue for Schwebel comes from retail customers. (Schwebel Dep. at 621; *see also* Doc. No. 45-1 (Declaration of James Pluchinsky ["Pluchinsky Decl."]) ¶¶ 6-7.) Retail customers are further categorized by size—A stop, B stop, or C stop—with an A stop being the largest by sales and a C stop being the smallest. (Schwebel Dep. at 619.) An A stop is a major grocery chain, a B Stop involves a smaller retail customer, and a C stop is typically a convenience store. "A stop" customers include Walmart, Target, Giant Eagle, Kroger, and Save-A-Lot. (Schwebel Dep. at 618.) A route driver typically serves a mix of A, B, and C stop customers. (*Id.* at 521; Pluchinsky Decl. ¶ 6.) Schwebel's top 10 retail customers—including Walmart and Giant Eagle—account for almost 75% of the company's gross revenue. (Draher Decl. ¶ 7, Ex. 3; Doc. No. 34 (Deposition of Jim Behmer ["Behmer Dep."]) at 777, 779; *see* Schwebel Dep. at 621.)

The parties agree with respect to some of the job duties of the route driver. For example, as to the servicing of retail customers, there is no dispute that route drivers pick up their vehicles at the distribution center, travel from customer to customer along set routes, deliver product and stock shelves, rotate existing product on the shelves, service any special displays, retrieve stale product from the shelves and return it to the distribution center at the end of the day, and prepare invoices and/or credit slips for the customer. (Boyd Decl. ¶¶ 10-12; Vukich Decl. ¶¶ 9-13; Boyd Dep. at 340; Schwebel Dep. at 660-62; Doc. No. 37-15 (Job Description for Route Sales Representative) at 2609.) Before returning to the distribution center, the route driver may be required to perform a "call-back" for one of the larger retail customers. This entails returning to the store, and straightening the shelves and delivering extra needed product. (Schwebel Dep. at 662; Boyd Decl. ¶ 16.) There is sharp disagreement, however, as to the extent to which route

drivers are required to perform sales functions while on their route, and it is this disagreement that serves as one of the focal points of plaintiffs' motion to conditionally certify.

On May 3, 2015, plaintiffs filed the present litigation, raising a single violation of the FLSA. They seek damages for unpaid wages and attorney's fees. Further, because they maintain that the alleged FLSA violation was willful pursuant to 28 U.S.C. § 255(a), plaintiffs have demanded wages dating back three years. (Compl. ¶ 27.) Specifically, plaintiffs complain that they, and similarly situated route drivers, were unlawfully denied overtime compensation for hours worked in excess of forty (40) per week by virtue of Schwebel's policy of classifying the position of route driver as exempt. (Compl. ¶¶ 15, 17, 26; Boyd Dep. at 338; Vukich Dep. at 490; *see* Boyd Decl. ¶ 7; Schwebel Dep. at 665.) By their motion for conditional certification, plaintiffs seek to represent the following class:

> All workers who were employed by Defendant Schwebel as a Route Sales delivery driver (or similar position), spent all or part of their workweek driving a vehicle that weighed 10,000 pounds or less, and did not receive overtime for hours worked over forty (40) per workweek during the last three years.

(Compl. ¶ 5; *see* Con. Cert. Mot. at 2616.)

The Court scheduled this matter for a Case Management Conference ("CMC"). Immediately prior to the CMC on July 24, 2015, plaintiffs filed their first motion to conditionally certify the class. (Doc. No. 13.) At the CMC that followed, the Court discussed with the parties the pending motion for conditional certification. Counsel for defendant indicated that defendant wished to conduct some discovery before responding to the motion. The Court agreed that the parties could engage in a period of discovery, limited to the issue of certification. "Because both sides [would be] afforded an opportunity to conduct discovery, counsel [was advised] that the Court will apply the 'modest plus' standard to plaintiffs' conditional certification motion."

4

(Minutes from July 24, 2015 CMC.) At the conclusion of the CMC, the Court permitted plaintiffs to withdraw their initial conditional certification motion in order to file a new motion under the "modest plus" standard at the conclusion of conditional certification discovery. Plaintiffs filed their renewed motion on October 30, 2015.

## II. STANDARD OF REVIEW

A collective action under the FLSA "may be maintained against any employer . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing[.]" 29 U.S.C. § 216(b). Thus, in order to join a collective action, an employee must (1) be "similarly situated" to the plaintiff who maintains the action, and (2) give his written consent to join. *Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 546 (6th Cir. 2006). A collective action brought under § 216(b) is distinguishable from a class action, which is governed by Federal Rule of Civil Procedure 23, in that plaintiffs in a collective action must "opt-in" rather than "opt-out" of the lawsuit. *Id.* The "opt-in" nature of the collective action "heightens the need for employees to 'receiv[e] accurate and timely notice concerning the pendency of the collective action.'" *Castillo v. Morales, Inc.*, 302 F.R.D. 480, 483 (S.D. Ohio 2014) (quoting *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170, 110 S. Ct. 482, 107 L. Ed. 2d 480 (1989)). The statute, therefore, vests in the district court the discretion to facilitate notice to potential plaintiffs "in appropriate cases[.]" *Hoffmann-La Roche*, 493 U.S. at 169.

The Sixth Circuit has "implicitly upheld a two-step procedure for determining whether an FLSA case should proceed as a collective action." *Heibel v. U.S. Bank Nat'l Ass'n*, No. 2:11-CV-00593, 2012 WL 4463771, at *2 (S.D. Ohio Sept. 27, 2012) (citing *In re HCR ManorCare, Inc.*, No. 113866, 2011 WL 7461073, at *1 (6th Cir. Sept. 28, 2011)) (further citation omitted);

5

*see also Watson v. Advanced Distrib. Servs., LLC*, 298 F.R.D. 558 (M.D. Tenn. 2014) (applying two-step procedure); *McNelley v. ALDI, Inc*., No. 1:09 CV 1868, 2009 WL 7630236 (N.D. Ohio Nov. 17, 2009) (same). "The first [step] takes place at the beginning of discovery. The second occurs after all of the opt-in forms have been received and discovery has concluded." *Comer*, 454 F.3d at 546 (quotation marks and citations omitted).

At the first step, the plaintiff bears the burden of showing that the employees in the class are "similarly situated." *Comer*, 454 F.3d at 546. To satisfy this burden at this initial notice stage, the plaintiff must only "make a modest factual showing" that he is similarly situated to the other employees he is seeking to notify. *Id*. 546-47 (quotation marks and citations omitted). The standard at the notice stage is "fairly lenient . . . and typically results in 'conditional certification' of a representative class[.]" *Id*. at 547 (quoting *Morisky v. Pub. Serv. Elec. & Gas Co*., 111 F. Supp. 2d 493, 497 (D. N.J. 2000)) (further citation omitted).

During this preliminary stage, a district court does not generally consider the merits of the claims, resolve factual disputes, or evaluate credibility. *Swigart v. Fifth Third Bank*, 276 F.R.D. 210, 214 (S.D. Ohio 2011). Moreover, the FLSA does not import "the more stringent criteria for class certification under Fed. R. Civ. P. 23" and it is also "less stringent than [the] Rule 20(a) requirement that claims 'arise out of the same action or occurrence' for joinder to be proper[.]" *O'Brien v. Ed Donnelly Enter., Inc*., 575 F.3d 567, 584 (6th Cir. 2009).

As regards the initial inquiry into whether plaintiffs are similarly situated with the proposed collective, the Sixth Circuit has observed that "plaintiffs are similarly situated when they suffer from a single, FLSA-violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs." *O'Brien*, 575 F.3d at 585. The court in *O'Brien* also explained, however, that "[s]howing a 'unified policy' of violation is

6

not required" to support conditional certification of a collective action. *Id*. at 584. Rather, plaintiffs may also meet the similarly situated requirement if they can demonstrate, at a minimum, that "their claims [are] unified by common theories of defendants' statutory violations, even if the proofs of these theories are inevitably individualized and distinct." *Id*. at 585; *see Harrison v. McDonald's Corp*., 411 F. Supp. 2d 862, 865-66 (S.D. Ohio 2005) (At this stage, a plaintiff must establish a "colorable basis" for his allegation that others are similarly situated and should therefore be notified of the action.) (quotation marks and citations omitted); *see also Lewis v. Huntington Nat'l Bank*, 789 F. Supp. 2d 863, 867 (S.D. Ohio 2011) (at the initial notice stage, "the named plaintiff need only show that [his] position [is] similar, not identical, to the positions held by the putative class members").

During the second step (or phase), courts have discretion to make a thorough finding regarding the "similarly situated" requirement, based upon a more fully developed record. *See Comer*, 454 F.3d at 547. At this time, a court is more inclined to consider "'(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff, [and] (3) fairness and procedural considerations . . . .'" *White v. MPW Indus. Servs., Inc*., 236 F.R.D. 363, 367 (E.D. Tenn. 2006) (quoting *Theissen v. Gen. Elec. Capital Corp*., 267 F.3d 1095, 1103 (10th Cir. 2001)). Should the district court determine that, after this more rigorous and fact-intensive analysis, the claimants are similarly situated, "the district court allows the representative action to proceed to trial. If the claimants are not similarly situated, the district court decertifies the class, and the opt-in plaintiffs are dismissed without prejudice." *Douglas v. GE Energy Reuter Stokes*, No. 1:07CV077, 2007 WL 1341779, at *4 (N.D. Ohio Apr. 30, 2007).

Where, as here, substantial discovery on the question of conditional certification has already taken place, courts have employed a standard that falls between the "modest" showing required at the first step, and the more exacting showing required at the second step. *See Creely v. HCR ManorCare, Inc.*, 789 F. Supp. 2d 819, 823-27 (N.D. Ohio 2011) (discussing cases). Often referred to as a "modest plus" factual showing, under this hybrid standard the court looks beyond plaintiffs' complaint allegations and supporting affidavits to determine whether there is a group of potentially similarly situated plaintiffs. *Id*.

"Precisely where the 'hybrid' approach lands on the spectrum between the lenient approach of the first stage, and the more stringent approach of the second stage, is not settled and by its very nature does not lend itself to a clear rule applicable in all cases." *Neff v. U.S. Xpress, Inc*., No. 2:10-cv-948, 2013 WL 4479078, at *3 (S.D. Ohio Aug. 20, 2013). Still, the court in *Creely* identified several useful principles that are applicable at this intermediate stage:

- First, courts generally agree that allowing the parties to conduct some targeted discovery regarding the conditional certification question takes the question beyond the stage one evidentiary boundaries of the complaint's allegations and supporting affidavits. *See Pacheco [v. Boar's Head Provisions Co., Inc.]*, 671 F. Supp. 2d 957, 960 (W.D. Mich. 2009).

- Second, once beyond the stage one evidentiary boundaries, the courts should consider the evidence produced by plaintiff and defendant with the explicit acknowledgement that the body of evidence is necessarily incomplete. *See Kress [v. PricewaterhouseCoopers, LLP]*, 263 F.R.D. 623, 629 (E.D. Cal. 2009).

- Third, when reviewing the assembled evidence, the court's analysis is confined to evaluating whether the proposed class is 'similarly situated' and does not touch upon the merits of plaintiffs' claims. *See Olivo [v. GMAC Mortg. Corp*., 374 F. Supp. 2d 545, 548 (E.D. Mich. 2004); *Brabazon v. Aurora Health Care, Inc*., 2011 WL 1131097, at *4 (E.D. Wis. 2011) ("[T]he conditional certification inquiry should not delve into the merits of a plaintiff's claim.") and *O'Brien*, 575 F.3d at 585 (analysis is primarily focused on the "unified [ ] common theories of defendants' statutory violations," even if the proof of these theories may be

individualized and distinct and without the court evaluating the merits of the alleged statutory violations at this conditional certification juncture).

- And fourth, litigation and judicial efficiency concerns would point toward the court considering, but not requiring plaintiffs to show, the factors commonly considered under stage two in performing a 'similarly situated' analysis, resolving any gaps or doubts in the evidence in favor of plaintiffs based upon the incomplete, although potentially substantial, factual record in light of the equitable goals and policies embodied in the FLSA. *See Kress*, 263 F.R.D. at 629 (citing *Leuthold v. Destination Am., Inc.*, 224 F.R.D. 462, 467-68 (N.D. Cal. 2004)).

*Creely*, 789 F. Supp. at 826 (final parenthetical omitted); *see, e.g., Jungkunz v. Schaeffer's Inv. Research, Inc.*, No. 1:11-cv-00691, 2014 WL 1302553, at *7 (S.D. Ohio Mar. 31, 2014) (applying "modest plus" standard).

Applying these principles, the court in *Creely* articulated the standard for judging whether the plaintiffs have conditionally made out a case for FLSA class certification:

[I]n order to provide some measurable standard by which to judge if Plaintiffs have made a sufficient modest "plus" factual showing, and to prevent the absurd result of granting the parties time to do discovery on the conditional certification question but subsequently imposing no incremental hurdle in determining whether Plaintiffs may send opt-in notices, this Court will compare Plaintiffs' allegations set forth in their Complaint with the factual record assembled through discovery to determine whether Plaintiffs have made sufficient showing beyond their original allegations that would tend to make it more likely that a class of similarly situated employees exists. In other words, the Court will review whether Plaintiffs have advanced the ball down the field—showing that it is more likely that a group of similarly situated individuals may be uncovered by soliciting opt-in plaintiffs. And, because the Court will continue to use a lenient standard, Plaintiffs need not have moved the ball far down the field, but they need to have shown some progress as a result of the discovery as measured against the original allegations and defenses.

How much progress Plaintiffs have made will be considered in conjunction with Defendants' evidence and in the context of Plaintiffs' unshifting burden to prove their claims. However, the Court does not weigh the relative merits of the parties' clams at this conditional certification stage. A full and complete merit review of both sides' arguments is best preserved for the detailed and strict review conducted at stage two, when the Court and the parties have the benefit of a fully developed factual record.

9

*Id*. at 827 (internal record citation omitted).

## III. DISCUSSION

Plaintiffs argue that they have successfully "moved the ball down the field" such that it is more likely that a group of similarly situated individuals can be identified. Beyond their complaint allegations and supporting declarations, plaintiffs point to various company documents (including job descriptions and employee manuals), and also offer declarations from representatives of defendant's customers and excerpts from the depositions of company representatives. According to plaintiffs, this evidence shows that route drivers have very little ability and no duty to influence the company's sales as they negotiate their route each day, and that, as a result, they should not have been exempted from earning overtime pay. Defendant maintains, however, that plaintiffs' showing fails to satisfy the "modest plus" standard because their FLSA claim is precluded by the outside sales exemption and the Motor Carrier Act ("MCA") exemption. With respect to the former exemption, defendant insists that "fatal" to plaintiffs' certification motion is the "abundant evidence in the record which establishes" that route drivers have considerable sales responsibilities. (Con. Cert. Opp'n at 2677.)

### A. Substitution of Bankruptcy Trustee

Before the Court can reach the merits of the certification motion, it must address defendant's motion for judgment on the pleadings as to plaintiff Boyd's claim and plaintiffs' motion to amend. According to defendant's motion, plaintiff Boyd's claim is barred by the doctrine of judicial estoppel based on representations he made to the court in a separate bankruptcy action. On March 19, 2012, Boyd filed for Chapter 13 bankruptcy in the United States Bankruptcy Court for the Northern District of Ohio, Case No. 12-60782, and appended to

his petition a schedule of assets. (Doc. No. 47-2 at 4002; Doc. No. 47-3 at 4010, 4017.) Despite a continuing duty to update the asset schedule, defendant notes that Boyd did not revise this schedule to include his FLSA claim against Schwebel, even after the present FLSA action was filed in this Court. On March 30, 2015, the bankruptcy court approved his modified bankruptcy plan.[4] (Doc. No. 47-2; Doc. No. 47-5.)

"The doctrine of judicial estoppel 'generally prevents a party from prevailing in one phase of a case or an argument and then relying on a contradictory argument to prevail in another phase.'" *White v. Wyndham Vacation Ownership, Inc*., 617 F.3d 472, 476 (6th Cir. 2010) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001)). "In the bankruptcy context," the Sixth Circuit had observed that "'judicial estoppel bars a party from (1) asserting a position that is contrary to one that the party has asserted under oath in a prior proceeding, where (2) the prior court adopted the contrary position 'either as a preliminary matter or as part of a final disposition.'" *Id*. (quoting *Browning v. Levy*, 283 F.3d 761, 775-76 (6th Cir. 2002)). Courts have used judicial estoppel to bar employment-related claims that were not identified in bankruptcy petitions. *See, e.g., Garrett v. Univ. Hosp. of Cleveland, Inc.*, No. 1:12 CV 2371, 2013 WL 2186116, at *6 (N.D. Ohio May 21, 2013) (granting defendant in FLSA action judgment on the pleadings where plaintiff had failed to amend her bankruptcy schedule of assets to include wage and hour claim); *Harrah v. DSW Inc*., 852 F. Supp. 2d 900, 907 (N.D. Ohio 2012) (plaintiff's age discrimination claim was barred by judicial estoppel where plaintiff failed to disclose it in her bankruptcy filings).

---

[4] Plaintiff Boyd modified his plan on March 6, 2015, following his January 2015 separation from Schwebel, to indicate that he was no longer employed and to request a reduction in the monthly payment. (Doc. No. 47-2; Doc. No. 47-7.)  Boyd did not amend his schedule of assets at that time to include the present action, which was filed several weeks earlier.

In response to defendant's motion for judgment on the pleadings, plaintiff Boyd moved to amend the complaint to substitute his bankruptcy trustee, Toby Rosen, for him as a party in this action. In support of his motion to amend, Boyd has submitted supplemental evidence and authority demonstrating that the bankruptcy court has approved the trustee's motion to retain plaintiff's counsel in this action to pursue Boyd's FLSA claim. (Doc. No. 58; Doc. No. 58-1 (Order to Employ Attorney).)

In *Stephenson v. Malloy,* 700 F.3d 265, 272 (6th Cir. 2012), the Sixth Circuit observed that "a debtor's errors or omissions should not be attributed to the trustee for purposes of judicial estoppel." In allowing the trustee to step into the shoes of a debtor who had failed to disclose a pending negligence action, the court in *Stephenson* reasoned that because the defendants did not allege any wrongdoing on the part of the bankruptcy trustee, "[t]he trustee's pursuit of this action [was] therefore not contrary to a position he previously asserted under oath." *Id.* In the wake of *Stephenson*, courts within this circuit have permitted the substitution of a bankruptcy trustee for a plaintiff debtor who was judicially estopped from pursuing a claim. *See, e.g., Owens v. Dolgencorp, LLC*, No. 3:12-cv-313, 2013 WL 6795415, at *2 (S.D. Ohio Dec. 19, 2013) (approving the substitution of a trustee for plaintiff who failed to disclose FMLA claims in bankruptcy proceedings); *see also Stevenson v. Haddad*, 529 F. App'x 522, 523 (6th Cir. 2013) (vacating the trial court's judgment dismissing the trustee's claims, noting that the "court's categorical estoppel-of-all-claims-by-all-parties cannot stand in light of our recent decision in *Stephenson v. Malloy* that 'a debtor's errors or omissions should not be attributed to the trustee for purposes of judicial estoppel'") (quoting *Stephenson*, 700 F.3d at 272).

Because defendant has not alleged any wrongdoing or omissions on the part of the bankruptcy trustee, plaintiff Boyd's motion to amend the complaint to substitute the trustee as a

plaintiff in his place is granted. For all of the same reasons, defendant's motion for judgment on the pleadings is denied.

### B.    Conditional Certification

#### 1.    *Unifying Policies and Theories*

Because the Court is applying the "modest plus" standard, the Court begins its analysis of plaintiffs' motion for conditional certification with plaintiffs' complaint allegations and looks to see whether plaintiffs have "advanced the ball down the field" in showing the existence of a class of similarly situated individuals. *See Creely*, 789 F. Supp. 2d at 829. Plaintiffs allege that they, and similarly situated individuals, did not qualify for an exemption from wage and overtime obligations, but were, nevertheless, denied overtime pay in violation of the FLSA. (Compl. ¶¶ 24-25.) A company-wide consistent application of a classification of a position as exempt can serve as a basis for conditional certification of an FLSA class where the classification is the source of the alleged violation. *See O'Brien*, 575 F.3d at 585.

In support of conditional certification, plaintiffs offer evidence that they and the putative class are subject to the same company policy that classifies the position of route driver as exempt from the requirement of overtime payment. (Boyd Dep. at 338; Vukich Dep. at 490; Boyd Decl. ¶ 7.) Defendant does not deny that the position in question was and remains classified as exempt. (*See* Schwebel Dep. at 665.) Plaintiffs also offer evidence that approximately 283 individuals were affected by this classification in the last three years in that they drove small vehicles in Ohio and Pennsylvania and worked over 40 hours in one or more workweeks during that time period. (Draher Decl. ¶ 8, Ex. 3; Doc. No. 36-2 (summary of Schwebel drivers driving small vehicles).)

According to plaintiffs, there are other uniform policies and procedures that apply to all route drivers. Specifically, plaintiffs note that all route drivers were paid a combination of a set base salary and a varying commission based on sales along the route, while transport drivers do not receive a commission.[5] (Schwebel Dep. at 649; Vukich Decl. ¶ 6; Boyd Decl. ¶ 7.) Additionally, as previously observed, all route drivers follow a set route and perform the same or roughly the same duties with respect to delivery, stocking the shelves, rotating existing product, retrieving stale product, and performing call-backs for larger retail customers. (Boyd Decl. ¶¶ 10-12; Vukvich Decl. ¶¶ 10-13; Boyd Dep. at 340; Schwebel Dep. at 660-62 (describing typical duties of route drivers); Doc. No. 37-15 (Job Description for Route Sales Representative) at 2609.) Moreover, the same employee handbook applies across the company to all route drivers, as does the same training manual. (Doc. No. 9 (Answer) ¶¶ 6, 7; Schwebel Dep. 665-65.)

While not challenging plaintiffs' argument that all route drivers are subject to a similar compensation scheme, defendants insist that compensation can vary substantially from route driver to route driver depending on a variety of factors, including whether the route driver is subject to a collective bargaining agreement, the identity of the customers that are visited along the route, and the varying efforts (and varying success of those efforts) of the individual route driver to promote Schwebel's products at the store level. Defendant offers charts showing the "vast difference in salary among [route drivers], the highest paid [route driver] in 2013 earned $100,485 (of which $77,102 was commission), compared to Boyd's salary of $62,796 (of which

---

[5] Transport drivers are solely responsible for the delivery of products from baking facilities to distribution centers and for the drop shipment of "private label" products, which are products that Schwebel bakes but packages under the private label of the grocery store. (Schwebel Dep. at 634, 641, 649; Boyd Dep. at 352.)

$42,311 was commission) and Vukich's salary of $49,350 (of which $29,480 was commission)."
(Con. Cert. Opp'n at 2682, citing charts.)

Additionally, defendant focuses on the variations in the typical workday of a route driver depending on the individual characteristics of the stores on the route, the drive-time between stores, the type of truck that is driven by the route driver, and name recognition of the Schwebel brand in the market area. Defendant suggests that these differences will necessitate an individualized assessment, making class treatment unmanageable.

The Court finds that plaintiffs' submissions constitute at least "some progress" moving beyond their complaint allegations and supporting declarations that they and the proposed collective "suffer from a single, FLSA-violating policy" that, if proved, would establish the collective's right to recover in damages. *See O'Brien*, 575 F.3d at 585. Further, even though the Court is viewing the parties' submissions through the somewhat more exacting "modest plus" lens, defendant's argument that the collective group is unmanageable and that individual issues predominate is properly reserved for the stage-two analysis. *Creely*, 789 F. Supp. 2d at 828 ("A stage-two analysis, after all of the opt-in plaintiffs have been identified, will be the proper time for [defendant] to renew arguments about variations among its facilities and staffing."); *see Drummond v. Herr Foods Inc.*, Civil Action No. 13-5991, 2015 WL 894329, at *3 (E.D. Pa. Mar. 2, 2015) (rejecting argument that the need for individual assessment of differing work experiences of route salespersons defeats conditional certification, noting that plaintiffs need only be "similarly situated, not identically so[,]" and reserving consideration of evidence of differing duties "for another day"); *Smith v. Bimbo Bakeries USA, Inc.*, No. CV 12-1689-CAS (JWx), 2013 WL 4479294, at *4 (C.D. Cal. Aug. 19, 2013) ("A detailed analysis of such issues as differing job functions is more properly made at the second step of the certification process.")

15

(quotation marks and citation omitted). "This is all the more true here where the extent of the differences between [route drivers'] job duties will depend in large part on which [route drivers] chose to opt-in to this action." *Id*.

    2. *Defenses and Exemptions*

  Still, because the Court is proceeding under the intermediate level of scrutiny, it is appropriate to consider—without deciding the merits of—defendant's defense that certain exemptions apply to the position of route driver. As previously observed, defendant maintains that two such exemptions apply: the outside salesman exemption and the Motor Carrier Act ("MCA") exemption.

    a. <u>Outside Sales Exemption</u>

  It is defendant's position that route drivers who comprise the proposed collective action are outside salesmen as that term is defined by Congress. *See* 29 U.S.C. § 213(a)(1). According to the governing regulation, "[t]he term 'employee employed in the capacity of outside salesman'" means any employee:

> (1) Whose primary duty is: (i) making sales within the meaning of section 3(k) of the [FLSA], or (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and
>
> (2) Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.

29 C.F.R. § 541.500(a). In deciding whether an employee's primary duty is making sales or obtaining orders or contracts, courts are to keep in mind that:

> work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall be regarded as exempt outside sales work. Other work that furthers the employee's sales efforts shall be regarded as exempt outside sales work. Other work that furthers the employee's sales efforts shall also be regarded as exempt work

16

including, for example, writing sales reports, updating or revising the employee's sales or display catalogue, planning itineraries and attending sales conferences.

29 C.F.R. § 541.500(b).

Section 541.700 defines and expands upon the term "primary duty," in relevant part, as follows:

> (a)    To qualify for exemption under this part, an employee's "primary duty" must be the performance of exempt work. The term "primary duty" means the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

> (b)    The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee. Thus, employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement. Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion.

29 C.F.R. § 541.700.

According to plaintiff Boyd, his primary duty as a route driver was to "deliver baked products to Schwebel's customers and to manage inventory." (Boyd Decl. ¶ 10; *see* Vukich Decl. ¶ 9 (same).) Plaintiff Vukich similarly described the position of route driver, in his deposition, as that of a "[g]lorified route boy." (Vukich Dep. at 492.) In support, plaintiffs point to evidence in the record that tends to show that most sales functions were performed at the corporate level.

Specifically, plaintiffs note that the right to place product in the stores of Schwebel's top 10 customers was determined by a "buyer" or "category manager." (Schwebel Dep. at 629; Behmer Dep. at 778.) Schwebel's President, Paul Schwebel, testified that district sales and corporate account managers were responsible for Schwebel's retail customers, and that these managers would interact with these customers multiple times a week. (Schwebel Dep. at 617-18, 624, 630; *see* Eckman Dep. at 799, 803, 818.)

The location of the product on the customer's shelves, along with the amount of space devoted to the product by these top customers, was determined through the use of plan-o-grams, merchandizing plans, store maps or other spacing planning documents or instruction (collectively referred to as "plan-o-grams"). (Schwebel Dep. at 631; Behmer Dep. at 775; Doc. No. 36-8 (Declaration of Amy Allison ["Allison Decl."]) ¶ 10; Doc. No. 36-11 (Declaration of Jeff Stirk ["Stirk Decl."]) ¶ 9; Doc. No. 37-1 (Declaration of Margarita Caraballo ["Caraballo Decl."]) ¶ 8; Vukich Dep. at 526.) A plan-o-gram is a "marketing plan for a particular store that designates shelf spaces, identifies which products are to be placed on the shelves, and lays out any in-store advertising plans." *Killion v. KeHE Distrib., LLC*, 761 F.3d 574, 578 (6th Cir. 2014); (Schwebel Dep. at 631). The plan-o-gram is negotiated at the corporate level and reflects the agreement between Schwebel's management team and the customer regarding product selection and placement. (Schwebel Dep. at 631; Allison Decl. ¶¶ 7-10; Stirk Decl. ¶ 9; Caraballo Decl. ¶ 8; Doc. No. 45-12 (Affidavit of Greg Birchfield ["Birchfield Aff."]) ¶ 2.)

Plaintiffs further offer evidence tending to show that route drivers have limited or no ability to convince an individual store manager to deviate from the plan-o-gram and offer Schwebel more shelf space. (*See* Stirk Decl. ¶ 9.) For example, Amy Allison, Senior Category Manager for Giant Eagle, declares that Giant Eagle's store managers have no authority to deviate

18

from the corporate-level decisions regarding placement and shelf space of individual products. (Allison Decl. ¶ 12.) Similarly, Jeff Stirk, Corporate Category Manager for Kroger Co., another major customer of Schwebel, declares that its store managers are required to follow the plan-o-gram. (Stirk Decl. ¶ 11.) He further notes that route drivers are not part of the collaborative corporate team that determines product orders and shelf space, and that route drivers have only a limited ability to influence product placement, such as in the case of a temporary promotional display.[6] (*Id*. ¶ 10.)

Plaintiffs maintain that the evidence further shows that Schwebel does not keep any record of clients originating from solicitations from route drivers, or track the sales from these solicitations. (Eckman Dep. at 816-17.) Additionally, both named plaintiffs testified that route drivers are not required to solicit new business or accounts, and that neither individual was ever disciplined or reprimanded for failing to generate additional sales. (Vukich Dep. at 561-62; Boyd Dep. at 340; *see* Boyd Decl. ¶ 14; Vukich Decl. ¶ 15.)

Plaintiffs suggest that all of these facts bring the case in line with the Sixth Circuit's decision in *Killion v. KeHE*. There, "sales representatives" for a food distributor servicing several large chain retailers brought suit under the FLSA claiming that they were improperly classified as outside salesmen. The sales representatives had many of the same duties as Schwebel's route drivers, including replenishing shelves according to plan-o-grams. While these sales representatives were free to attempt to jockey for additional shelf space at the store level, the evidence showed that they were generally unsuccessful because the large retail chains—such

---

[6] Plaintiffs also offered evidence tending to show that "off-shelf displays" are set at the corporate level and are usually only authorized by the customer in connection with promotions and holidays, without any input from the route drivers. (Allison Decl. ¶ 13; Stirk Decl. ¶ 12; Vukich Dep. at 561.)
]

as Walmart, Kroger, and Giant Eagle—generally adhered to their set plan-o-grams. *Killion*, 761

F.3d at 584. In ruling that the district court erred in holding that there was no question of material

fact as to whether making sales was the primary duty of a sales representative, the court relied on

the fact that there was at least some evidence in the record suggesting that the development and

cultivation of customer relations, and the determination of the products to be sold, were made at

the corporate level. *Id.*

Defendant contends that *Killion* is inapposite because the evidence shows that,

notwithstanding the experience of plaintiffs, "[t]he heart of the [route driver] position is to help

grow Schwebel's market share by promoting Schwebel products with fresh, well-merchandised

product and customer service that outshines its competitors."[7] (Con. Cert. Opp'n at 2683, citing

Eckman Decl. ¶ 3.) While defendant concedes that, like most distributors, it relies on plan-o-

grams to determine shelf space (*see id.* at 2684), it suggests that route drivers can and do

successfully influence the actual placement of their company's product in the individual retail

stores. (Schwebel Dep. at 631 ["A route salesman has a big effect on how a planogram is

determined at the retailers."].) Defendant directs the Court's attention to evidence from company

executives that route drivers are expected to maximize their sales by increasing shelf space, and

that they accomplish this primarily by convincing store managers to put up special displays.

(Doc. No. 45-3 (Declaration of Robert Monnot ["Monnot Decl."]) ¶¶ 6-7; Doc. No. 45-7

(Declaration of Phillip Chase ["Chase Decl."]) ¶ 10; Doc. No. 45-4 (Declaration of Gary

Huffman ["Huffman Decl."]) ¶¶ 10-11; Doc. No. 45-6 (Declaration of Joel Kingera ["Kingera

---

[7] Defendant also takes issue with plaintiffs' evidence, noting that Amy Allison only joined Giant Eagle in 2015, and that, prior to her arrival, the grocery store chain had a more lenient policy of allowing store managers to make changes to the plan-o-grams.

Decl."]) ¶ 8; Doc. No. 45-5 (Declaration of Steve Leach ["Leach Decl."]) ¶ 7; *see* Behmer Dep. at 769.)

The Court finds that plaintiffs have sufficiently advanced the ball down the field such that it is more likely that there exists a potential collective of similarly situated individuals who may be able to join in plaintiffs' FLSA claim. The admissions from Schwebel's executives, when combined with statements from Schwebel's top customers, tend to demonstrate that such a class exists. Further, while defendant's evidence suggests that sales functions may be a component of the route driver's duties, defendant's evidence is not so overwhelming that there is a clear answer at this point in the litigation as to whether plaintiffs and the putative class are properly subject to the outside salesman exemption. *See Creely*, 789 F. Supp. 2d at 835 ("the focus of this Court's inquiry at this point in considering conditional certification is not on whether there has been an actual violation of law but rather on whether the proposed plaintiffs are similarly situated . . . with respect to their allegations that the law has been violated") (quotation marks and citation omitted). This is especially true considering the question the Court will ultimately need to answer in this litigation is not whether route drivers perform some sales functions, but whether sales is a "primary duty" of a route driver.

Additionally, defendant's suggestion that "there is no competent evidence to establish that anyone other than the [route driver] is responsible for ordering merchandise for their customers" is suspect. (Con. Cert. Opp'n at 2685.) Defendant offers testimony from company executives showing that route drivers must vary the amount of product they carry in their trucks depending on area and demand. (*Id.*, citing various deposition transcripts.) At this point it is unclear from the record, however, whether what defendant refers to as "strategic selling" is not really more akin to the type of re-ordering or maintaining of proper inventory levels that cannot

be considered sales under the governing regulations.[8] 29 C.F.R. § 541.504(d)(2) (drivers are non-exempt where "the amount of the sale is determined by the volume of the customer's sales since the previous delivery"); *see Killion*, 761F.3d at 583 (reordering of merchandise was not equivalent of making sales); *Hodgson v. Klages Coal & Ice Co.*, 435 F.2d 377, 383-85 (6th Cir. 1970) (orders placed based on experience and knowledge of customers' needs did not constitute sales).

Nonetheless, the parties have come forward with what appears, at least at this point in the litigation, to be conflicting evidence on the subject of whether route drivers are engaged in the selling of Schwebel products along their routes. The Court does not and cannot determine the ultimate question of whether route drivers constitute "outside salesmen" at this time. Though the parties' present submissions give every indication that decertification and summary judgment will be vigorously litigated on this subject, this issue is best left for another day.

### b. MCA Exemption

Section 13(b)(1) of the FLSA provides an overtime exemption for "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49[.]" 29 U.S.C. § 213(b)(1); *see also* 49 U.S.C. § 31502(b) (defining the scope of Secretary of Transportation's regulatory authority). "Congress elaborated upon the Motor Carrier Act Exemption with the

---

[8] Even more questionable is defendant's argument that "there is little doubt that it is the [route driver] and no one else who actually sells bread to Schwebel customers. After all, with each order that is delivered it is the [route driver] alone who is responsible for transferring possession of the bread to the customer, a transaction that is formalized with the printing and signature on a document which results in the customer being invoiced (and the [route driver] being relieved of financial responsibility) for each bakery item sold." (Opp'n at 2686, record citation omitted). Of course, if this were the case, then every truck driver would be considered the "salesman" of any product he delivers to a customer, regardless of his role in the sale negotiation. *See Miller v. Farmer Bros. Co.*, 150 P.3d 598, 602 (Wash. App. Ct. 2007) ("If making a sale is nothing more than exchanging product for payment, then almost all deliveries would qualify as outside sales."); *see also Killion*, 761 F.3d at 584 (rejecting argument that route drivers affect sales simply because they hit the order button on their electronic devices).

enactment of the Corrections Act of 2008." *McMaster v. E. Armored Servs., Inc.*, 780 F.3d 167, 169 (3d Cir. 2015). Section 306(a) provides that "Section 7 of the Fair Labor Standards Act . . . shall apply to a covered employee not withstanding section 13(b)(1) of that Act." Section 306(c) defines the term "covered employee" to include an employee "of a motor carrier whose job, 'in whole or in part,' affects the safe operation of vehicles lighter than 10,000 pounds, except vehicles designed to transport hazardous materials or large numbers of passengers. *McMaster*, 780 F.3d at 169 (quoting Technical Corrections Act § 306(c)).

Plaintiffs maintain that the proposed collective is not subject to the MCA exemption because its estimated 283 members drove small vehicles and worked 40 hours in a week during the relevant time period without receiving overtime pay. In support, plaintiffs direct the Court's attention to a summary of company records tracking the vehicles (by weight) driven by route drivers during the relevant time period. (Draher Decl. ¶ 5, Ex. 1.)

Defendant does not challenge these records. Instead, defendant complains that the records demonstrate that some members of the proposed collective operated both small and large vehicles during the relevant time period. It insists that distinguishing which of these individuals are covered by the exemption will require an individualized inquiry unsuited for collective treatment. (Opp'n at 2698.) As previously observed, however, the need for individual assessments does not necessarily defeat certification at this intermediate stage. *See Creely*, 789 F. Supp. 2d at 826 (quoting *O'Brien*, 575 F.3d at 585) (allowing for conditional certification upon the showing of a common violation or unifying theory, "even if the proof of these theories may be individualized and distinct"). Additionally, defendant argues that plaintiffs have adopted a "very narrow interpretation of the MCA exemption" that is not supported by the law. (*Id.* at 2677.) Such an argument goes to the merits of plaintiff's claim and defendant's exemption

23

defense and need not be resolved at this stage of the litigation. *Creely*, 739 F. Supp. 2d at 826 (citing, among authority, *Olivo*, 374 F. Supp. 2d at 548).

Thus, for purposes of conditional certification, the Court finds that plaintiff has advanced the ball far enough down the field such that they have made some progress in establishing that a group of similarly situated individuals exists to form a collective in this action. "A full and complete merit review of both sides' arguments is best preserved for the detailed and strict review conducted at stage two, when the Court and the parties have the benefit of a fully developed factual record." *Creely*, 789 F. Supp. 2d at 827.

## IV. CONCLUSION

For all of the foregoing reasons, plaintiffs' motion for conditional certification (Doc. No. 38) is granted, as is plaintiff Boyd's motion to amend the complaint to substitute Bankruptcy Trustee Toby Rosen as a party plaintiff (Doc. No. 50). Defendant's motion for judgment on the pleadings (Doc. No. 47) is denied.

The Court directs the parties to meet and confer in good faith for the purpose of negotiating the language of the notice that is to be issued to the proposed collective and the procedure for issuing the notice. If they are able to agree upon the form of the notice, within 10 days of this Memorandum Opinion, the parties shall submit a joint proposed notice for the Court's final approval. If they are unable to agree, they shall so notify the Court and the Court shall resolve the conflict. The Court further directs that, within 30 days of the approval of the form of the notice by the Court, said notice shall be sent to all potential collective members. Finally, the parties should jointly contact the Court if, during this 30 period, they would like the

Court to refer this matter to the magistrate judge for mediation.

      **IT IS SO ORDERED**.


Dated: June 30, 2016

                                                             **HONORABLE SARA LIOI**
                                                           **UNITED STATES DISTRICT JUDGE**